UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

       v.                                    Crim. No. 1:08-cr-119-1

Benjamin Osmanson

## OPINION AND ORDER AND
## REPORT AND RECOMMENDATION
(Docs. 87, 106)

On October 16, 2013, Defendant Benjamin Osmanson—proceeding *pro se* at that time—filed a Motion under 28 U.S.C. § 2255 to Vacate and amend the sentence imposed upon him in this case.  (Doc. 87.)  Osmanson's sentence was imposed on January 11, 2010 following his plea of guilty to three counts stemming from his participation in a mortgage fraud scheme in 2006 and 2007.  (*See* Docs. 70, 71.)[1]  In his § 2255 Motion, Osmanson asserts that his sentence is constitutionally defective because "the government engaged in deliberate misconduct during the sentencing process."  (Doc. 87 at 3.)  According to Osmanson, the prosecution knew or should have known that the banks that made the mortgage loans were complicit and were being investigated by the federal government for their mortgage lending practices, but failed to disclose that information and persisted in characterizing the banks as victims of Osmanson's fraud.  For relief,

---

[1]  The three counts to which Osmanson pleaded guilty were: (1) conspiracy to commit wire fraud in violation of 18 U.S.C. § 371; (2) wire fraud in violation of 18 U.S.C. § 1343; and (3) money laundering in violation of 18 U.S.C. § 1957.  (Doc. 71 at 1.)

Osmanson seeks to have his sentence vacated, and to be resentenced "on the basis of a complete and accurate record." (*Id.* at 1.)

The government has filed an Opposition to Osmanson's Motion, arguing that his filing is time-barred, procedurally barred, and without merit. (Doc. 98 at 1.) On April 7, 2014, Osmanson—now represented by counsel—filed a Reply as well as a Motion for Leave to Conduct Discovery under Rule 6 of the Rules Governing Section 2255 Proceedings and a request for an evidentiary hearing. (Doc. 106.) After receiving permission and an extension of time, the government filed a combined Surreply opposing Osmanson's § 2255 Motion, and a Response opposing Osmanson's Motion for discovery and a hearing. (Docs. 112, 113.) After receiving permission from the Court, Osmanson filed his own Surreply on June 20, 2014. (Doc. 117.)

Argument on the Motions was held on June 25, 2014. For the reasons set forth below, Osmanson's Motion for Leave to Conduct Discovery and his request for an evidentiary hearing (Doc. 106) is DENIED, and I recommend that his § 2255 Motion (Doc. 87) be DISMISSED.

## Factual Background and Procedural History

From January 2006 through the spring of 2007, Osmanson participated in a scheme to obtain fraudulent mortgage loans in the names of family and friends. More specifically, Osmanson and his partner Jillian Protzman worked with several mortgage brokers, real estate agents, and loan officers to obtain 100% financing for the purchase of dozens of properties in California, Florida, Kentucky, and Vermont at a total cost of more than $26 million. Each transaction was structured to produce a cash rebate. Osmanson

and Protzman submitted false loan applications in order to obtain the loans, each of which was a low-documentation "stated income" loan.  The lenders included Countrywide Financial Corporation, Lehman Brothers, Bear Stearns, and Merrill Lynch, among others (collectively, the "Banks").  The scheme began to unravel in early 2007 as the mortgage payments went into arrears.  Many of the properties were ultimately sold at a loss in foreclosure sales; total losses exceeded $12 million.

Law enforcement commenced an investigation into Osmanson's dealings.  In June 2007, FBI and IRS agents interviewed him, and he acknowledged during the interview that he and Protzman had submitted loan applications that he knew to contain false information.  He also stated, however, that he "had been led to believe by industry insiders that submitting loan applications containing inaccurate information was a standard industry practice."  (Doc. 87-5 at 12.)  Osmanson asserted that "the lenders extended mortgages to his investors in violation of accepted underwriting standards," and that the lenders did so "because they were more concerned with increasing the volume of loans being originated so that the loans could be packaged into bundles and sold as securities."  (*Id.*)  In another June 2007 interview with a federal prosecutor and with FBI Special Agent James Formica, Osmanson—then represented by counsel—again asserted that the lenders' primary concern was increasing the volume of loans being originated. (*Id.*)

A grand jury returned an eleven-count indictment as to Osmanson on October 2, 2008.  (Doc. 1.)  Osmanson was arraigned and ordered detained on

November 24, 2008.  (*See* Doc. 26.)  On September 14, 2009, pursuant to a plea

agreement (Doc. 55), Osmanson pleaded guilty to three of the counts against him.  (*See*

Doc. 56.)  The Court accepted the plea, ordered a presentence report (PSR), and set the

case for sentencing.  (*Id.*)

      The United States Probation Office interviewed Osmanson in the course of

preparing the PSR.  At the interview, Osmanson reiterated that "he had been led to

believe by industry insiders that submitting loan applications containing false information

was a standard industry practice" and that "none of the lenders viewed the representations

in the mortgage-loan applications as material in their decision to fund such loans."  (Doc.

87-5 at 20.)  The completed PSR describes the banks and mortgage companies that

provided financing to Osmanson's investors as one of the categories of "victims" in the

case.  The PSR calculated Osmanson's total offense level under the United States

Sentencing Guidelines Manual to be 31 and his criminal history to be category I, for a

guideline imprisonment range of 108 to 135 months.

      On January 4, 2010, prior to sentencing, the parties submitted sentencing

memoranda.  The prosecution urged the Court to adopt the findings and

recommendations in the PSR, and to find that an additional four-level enhancement under

USSG § 3B1.1(a) for leadership applied.  (Doc. 65 at 4.)  The prosecution therefore

sought a sentence within the guideline range of 168 to 210 months.  In its memorandum,

the prosecution asserted that Osmanson and Protzman had "perpetrat[ed] a fraud on the

lending banks" (*id.* at 2), and that "[t]he lending institutions defrauded by Osmanson's

fraudulent paperwork have been left with over $12 million in actual losses even after the

foreclosure sales" (*id.* at 12–13).  The prosecution specifically argued that "the direct victims of Osmanson's false statements were the lending institutions who provided the fraudulently obtained loans."  (*Id.* at 15.)

In her sentencing memorandum, defense counsel Alison S. Arms requested a sentence below the low end of the Sentencing Guidelines, arguing that Osmanson's conduct was "less complicated and less malicious" than it had been portrayed to be. (Doc. 66 at 1–2.)  According to Arms, "Osmanson took advantage of pervasive mortgage industry practices in order to assist the purchase of a number of properties in anticipation of a gain on resale for the benefit of family and friends."  (*Id.* at 2.)  Specifically, Arms cited lax lending standards and a lending industry that "encouraged the irresponsible lending that permitted the entire plan to proceed."  (*Id.* at 3, 5.)  With respect to the leadership role enhancement, Arms argued that "[e]ach of the coconspirators fulfilled a vital role to the success of the investment plan" and that Osmanson "could not have directed each individual for he did not possess the expertise to direct their decision-making within their field."  (*Id.* at 31.)

At the January 11, 2010 sentencing hearing, Arms remarked that she thought "the primary issue is whether or not there should be a leadership role in this case and whether or not 18 U.S.C. [§] 3553(a) warrants a departure from the guidelines range."  (Doc. 83, Sentencing Tr. at 3:22–25.)  Later in the proceedings, Arms stated:

> The entire mortgage lending industry said we're going to encourage you to lie to us so that you can acquire properties.  And everyone, all along the chain, the sellers who realized full value for their properties, the buyers who acquired an asset and knew that the rebates were coming, [were] allegedly complicit themselves.  The realtors who took commission[s].  The

brokers who took commissions [and] who took cuts from their broker buddies.  The banks who made the loans knowing that they were based upon potential falsehoods and the larger security industry.

(*Id.* at 138:1–11.)  Regarding the leadership enhancement, Arms asked the Court to impose a five-year sentence, arguing that such a sentence would "accurately reflect what his role was."  (*Id.* at 142:12–16.)

> For its part, the government argued, among other things:
>
> Your Honor, I think the first thing to address in this case is an argument that I find somewhat surprising at the sentencing of a defendant who [has] plead[ed] guilty and supposedly taken responsibility for his scheme.  And that's that the bank made me do it.  Because we've heard that a lot today.  And I'm not about to argue that the banks didn't throw the flood gates open and offer some really horrible products during this period of time. . . .
>
> I think it is fair to say that credit was widely available, that loans were easy to get, but, Your Honor, if you think about it in some ways it's a little like leaving a door unlocked in a high[-]crime neighborhood.  It's not a smart thing to do.  But it doesn't mean that the person that goes in and burglarizes the home hasn't committed a crime.

(*Id.* at 147:18–148:3.)  The government conceded that "[t]here were market problems no doubt," but maintained that "this was a fraud that was perpetrated against the lenders and it was orchestrated by Mr. Osmanson."  (*Id.* at 153:5–7.)  Neither party—in their sentencing memoranda or at the sentencing hearing—explicitly mentioned that the federal government was investigating the "victim" Banks for their own fraudulent mortgage practices.

After hearing the evidence and argument, the Court stated: "I have to agree with both sides in the sense that Mr. Osmanson you would not be here but for perhaps the market, perhaps for other people who assisted you in this fraud . . . ."  (*Id.* at 164:3–6.)

The Court went on to state, however, that Osmanson was "the person who was in the middle." (*Id.* at 164:6.) Addressing Osmanson, the Court remarked:

> You knew what was going on from all sides. Others had knowledge about some aspects of the fraud but did not again have the full picture.
>
> But for you initiating this scheme it wouldn't have happened. Some people did assist you, did have knowledge that was passed on to you which encouraged perhaps your fraudulent activities. But as the government points out you were the one who did the lying and the scheming. Even you admitted that in your statement.
>
> I'm not sure any of this would have worked without the, the lying that you did to verify people's incomes, to verify the amount of properties they owned and that sort of thing.

(*Id.* at 164:6–19.) On the question of the role enhancement, the Court found it to be a "[v]ery close" question, but elected not to impose the four-level enhancement, reasoning that "the sentence that he is going to get is sufficient but not greater under [§] 3553(a)." (*Id.* at 165:12–17.) The Court summarized as follows:

> So, again, I feel that it's a close question but I think that Mr. Osmanson was the center of the fraud scheme, that he recruited other professionals who acted in concert with him, that they were licensed professionals who committed criminal or certainly unethical acts to increase their joint profits. I feel that they were joint conspirators with him.

(*Id.* at 165:20–166:1.) The Court imposed a 108-month incarcerative sentence to be followed by a five-year term of supervised release, in addition to more than $12 million in restitution. (Doc. 70.) The Court accordingly issued a Judgment, which was entered on the docket January 13, 2010. (Doc. 71.) Osmanson did not file an appeal.

Osmanson has been incarcerated from the time of his 2010 sentencing until the present in the custody of the Bureau of Prisons ("BOP"). The Education Department at

the BOP facility in Lompoc, California where Osmanson has been serving his sentence does not subscribe to *The New York Times*, *The Wall Street Journal*, or *The Los Angeles Times*. (*See* Doc. 106-1 at 2.) According to Osmanson, while at the Lompoc facility, he has had no way of regularly monitoring news from the financial world. (*See* Doc. 106 at 9; *see also* Doc. 117-5.)

However, Osmanson asserts that in October 2012 he fortuitously "learned through media accounts that the federal government had filed a lawsuit against Bank of America alleging that its Countrywide Financial unit had engaged in fraudulent loan origination practices that were systematic in nature." (Doc. 87-5 at 25.) Specifically, Osmanson says that he read the following news stories:[2] (1) an October 25, 2012 story from the *New York Times* entitled "U.S. Accuses Bank of America of a 'Brazen' Mortgage Fraud" (Doc. 87-1); (2) an October 25, 2012 story from *Bloomberg News* entitled "Bank of America Sued by U.S. over Mortgage Loan Sales" (Doc. 87-2); and (3) a December 9, 2012 *New York Times* story entitled "Mortgage Crisis Presents a New Reckoning to Banks" (Doc. 87-3).

Osmanson filed his § 2255 Motion on October 16, 2013. (Doc. 87.)

## Analysis

### I.   Osmanson's Request for Rule 6 Discovery and for an Evidentiary Hearing

In his § 2255 Motion and his Reply, Osmanson seeks an evidentiary hearing as well as authorization to conduct discovery. (*See* Doc. 87 at 7–9; Doc. 106 at 1 n.1, 18–

---

[2] Osmanson says that "a fellow inmate with personal subscriptions to the major newspapers where those articles appeared happened to share his papers with yet another inmate, who in turn knew the details of Mr. Osmanson's case and passed that information along to Mr. Osmanson." (Doc. 106 at 9; *see also* Doc. 117-5 at 2.)

21.)  Specifically, Osmanson requests discovery "in order to clarify exactly what, if any, federal criminal or civil investigations were taking place at or before Mr. Osmanson's sentencing, and whether the prosecution in Mr. Osmanson's case did, could, or should have known about them."  (Doc. 106 at 18.)  Regardless of whether the Court permits discovery, Osmanson also requests a hearing so that he can present new evidence and expand the record.  (*Id.* at 21.)

Under the Rules Governing Section 2255 Proceedings, "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 6(a).  Under Rule 7, "[i]f the motion is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the motion."  *Id.* Rule 7(a).  In addition, "[i]f the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted."  *Id.* Rule 8(a).

I conclude that the record is sufficient to rule on Osmanson's § 2255 Motion without Rule 6 discovery.  In addition, for the reasons below, Osmanson's § 2255 Motion should be dismissed; therefore Rules 7 and 8 do not apply.  Accordingly, Osmanson's Motion to Conduct Rule 6 Discovery and his request for an evidentiary hearing (Doc. 106) is DENIED.

## II.     Osmanson's § 2255 Motion is Time-Barred

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) created a one-year statute of limitations governing a federal prisoner's application for a writ of habeas corpus.  In pertinent part, the statute states:

> A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—
>
> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).  Osmanson makes no argument that § 2255(f)(1) or (f)(3) applies.[3]

According to Osmanson his Motion is timely under § 2255(f)(2) and (f)(4).  (Doc. 87 at 5.)

Osmanson maintains that the government bears the burden of proving that § 2255's statute of limitations lapsed before he filed his habeas petition.  (*See* Doc. 106 at 4, 10.)  It is true that, in general, a party asserting the statute of limitations as an affirmative defense bears the burden of proof.  *United States v. Livecchi*, 711 F.3d 345,

---

[3]     As to § 2255(f)(1), the judgment against Osmanson was entered on the docket on January 13, 2010, (Doc. 71 at 1), and since no appeal was taken, that judgment became final when the time for filing a notice of appeal expired fourteen days later on January 27, 2010. *See* Fed. R. App. P. 4(b)(1)(A)(i).  Thus the 1-year period under § 2255(f)(1) expired on January 27, 2011—well before Osmanson filed his § 2255 Motion.

352 (2d Cir. 2013) (per curiam); *see also DirecTV, Inc. v. Bunnapradist*, No. CV-03-

3399-SVW (SHSx), 2004 WL 5642008, at *1 (C.D. Cal. Apr. 6, 2004) ("Because barring

actions due to the lapse of the applicable statute of limitations is an affirmative defense,

the burden rests on Defendant to prove each element of the defense by a preponderance

of the evidence.").  But neither *Livecchi* nor *DirecTV* involve § 2255 petitions; *Livecchi*

was a civil action brought by the United States, and *DirecTV* was a civil action brought

by *DirecTV* alleging violations of federal anti-piracy and wiretapping laws.

Here, Osmanson is the party attempting to gain the benefit of a potentially later

accrual date under § 2255(f)(2) and (4).  It is therefore his burden to demonstrate due

diligence.  *See United States v. Nuckols*, No. 1:04-CR-139-01, 2009 WL 4684022, at *4

(D. Vt. Dec. 4, 2009) ("The burden of showing due diligence under § 2255(f)(4) is on the

petitioner.").  He also bears the burden with respect to § 2255(f)(2).  *See Caldwell v.*

*United States*, 671 F. Supp. 2d 177, 181 (D. Me. 2009) (noting petitioner's § 2255(f)(2)

burden).

Regarding § 2255(f)(2), Osmanson asserts in his Motion that the prosecution

intentionally misrepresented and concealed facts material to his sentencing—namely, that

the Banks themselves had engaged in mortgage fraud, and that the government was

investigating the Banks for that conduct.  (*See* Doc. 87 at 6.)  The prosecution's alleged

wrongful conduct, according to Osmanson, prevented him from making his § 2255

Motion until he learned the allegedly misrepresented and concealed facts for himself.

Since that argument largely overlaps with Osmanson's § 2255(f)(4) argument, I treat both

arguments together below.

The government maintains that the information concerning the legal action against Bank of America was publicly available well before October 2012.  (Doc. 98 at 6.)  In fact, notes the government, the very news articles that Osmanson cites contain references to earlier lawsuits against major U.S. banks challenging their mortgage practices.  (*See id.* at 6–7.)  Osmanson concedes that the government's investigation of those banks was public prior to October 2012, but insists that his "fortuitous exposure to those articles was the first time *he* was made aware of those investigations."  (Doc. 106 at 9 n.9.)

Osmanson's argument is not persuasive.  Section 2255(f)(4) specifically requires the Court to determine "the date on which the facts supporting the claim or claims presented *could have been discovered through the exercise of due diligence*."  28 U.S.C. § 2255(f)(4) (emphasis added).  Here, it appears that no amount of diligent research at the prison law library would have unearthed the October 2012 *New York Times* and *Bloomberg News* articles at issue, since the library did not have subscriptions to those publications.  *See Wims v. United States*, 225 F.3d 186, 191 (2d Cir. 2000) ("[E]valuation of due diligence may not 'ignore[] the reality of the prison system.'" (quoting *Easterwood v. Champion*, 213 F.3d 1321, 1323 (10th Cir. 2000))).

However, the Court can take judicial notice of news accounts that were publicly available while Osmanson was being investigated but prior to his October 2, 2008 indictment and subsequent detention.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents . . . .").  The press coverage available to Osmanson

during that time makes it clear that the facts underlying the claim he is now advancing could have been discovered with due diligence.[4]

For instance, *The Wall Street Journal* ran a story on March 8, 2008 noting that the FBI was investigating Countrywide Financial Corporation and fifteen other subprime companies, and was "examining mortgage-origination fraud, conflicts of interest and undisclosed relationships within the industry, and the practices used to package mortgage-backed securities for sale to investors."  Glenn R. Simpson & Evan Perez, *FBI Investigates Countrywide*, *Wall St. J.*, Mar. 8, 2008, at A3.  Other media outlets soon picked up the story.  *See* Raymond Hernandez, *Countrywide Said to be Subject of Federal Criminal Inquiry*, *N.Y. Times*, Mar. 9, 2008, at A20; *FBI Probes Countrywide for Possible Fraud*, *CNNMoney* (Mar. 10, 2008), http://money.cnn.com/2008/03/08/news/companies/countrywide_FBI/index.htm ("Federal authorities are looking into whether [Countrywide] used fraudulent lending practices.").  There are numerous other examples, many of which specifically refer to investigations of "stated income" loans or other

---

[4]  In this case, diligence was "in order," *Johnson v. United States*, 544 U.S. 295, 308 (2005), as early as Osmanson's June 2007 interview.  Although Osmanson was not charged with a crime until the October 2, 2008 indictment, he knew he was under investigation, was represented by counsel, and he had already begun formulating an argument based on allegations of the Banks' own misconduct.

failures to enforce adequate lending standards—i.e., the very kind of institutional fraud that Osmanson alleged against the Banks at his sentencing.[5]

In short, the fact that the government was investigating the Banks for mortgage fraud was readily available to the public and to Osmanson while he knew that he was the subject of investigations that led to his indictment for defrauding some of these very same institutions.[6]  The October 2012 articles that Osmanson read refer to the Justice Department's initiation of lawsuits against Bank of America and other Banks.  The fact of the investigations leading up to those lawsuits was public several years before then.  Even if Osmanson did not actually learn of the federal investigations into the Banks'

---

[5]  *See, e.g.*, Glenn R. Simpson, *Loan Data Focus of Probe*, Wall St. J., Mar. 11, 2008, at A3 ("[I]nvestigators are finding that Countrywide's loan documents often were marked by dubious or erroneous information about its mortgage clients . . . .  Many of the suspected loans were called 'stated' loans, in which a borrower was required to attest to his finances but wasn't required to provide proof.  Underwriters allegedly were instructed not to check many details of these loans."); Glenn R. Simpson & James R. Hagerty, *Countrywide Loss Focuses Attention on Underwriting*, Wall St. J., Apr. 30, 2008, at B1 ("A federal probe of Countrywide . . . is turning up evidence that sales executives at the company deliberately overlooked inflated income figures for many borrowers . . . ."); Lynnley Browning, *Government Intensifies Mortgage Investigation*, N.Y. Times, May 5, 2008, at C1 ("Federal agencies are intensifying a criminal investigation of the mortgage industry and focusing on whether some lenders turned a blind eye to inflated income figures provided by borrowers."); Corey Dade & Peter Eavis, *BofA Says Bid to Buy Countrywide is as Planned*, Wall St. J., May 6, 2008, at C1 (noting FBI's probe of Countrywide's underwriting while discussing Bank of America's bid to acquire Countrywide); Gretchen Morgenson, *Illinois Suit Set Against Countrywide*, N.Y. Times, June 25, 2008, at C1 (reporting on lawsuit accusing Countrywide of "relaxing underwriting standards" and of creating "incentives for its employees and brokers to sell questionable loans by paying them more on such sales"); Ruth Simon, *Countrywide's Pressures Mount*, Wall St. J., June 26, 2008, at A3 (reporting on three lawsuits against Countrywide); *SEC Begins Formal Probe of Countrywide*, Wall St. J., Aug. 9, 2008, at B4 ("The Securities and Exchange Commission escalated its scrutiny of Countrywide Financial Corp. into a formal investigation, according to a regulatory filing by Bank of America Corp.").

[6]  The federal government was not alone in scrutinizing or criticizing the Banks' mortgage lending practices.  Individual states had initiated lawsuits.  *See* Karen Gullo & Andrew Harris, *Countrywide Sued by California, Illinois, Over Loans*, Bloomberg News, June 25, 2008, *available at* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aEsd2SRYtj7A.  Commentators also suggested institutional wrongdoing.  *See* Charles R. Morris, *The Trillion Dollar Meltdown* 71 (2008) (asserting that Countrywide's practices amounted to robbery).

mortgage practices until late October 2012, with only minimal due diligence he could have learned of those investigations well before then.

Moreover, several of the sources cited in Osmanson's January 4, 2010 sentencing memorandum referred to the federal investigations.  A May 9, 2008 radio broadcast—quoted at length in Osmanson's January 2010 sentencing memorandum (*see* Doc. 66 at 8)—suggested that the FBI was investigating the fraud.  *See The Giant Pool of Money* (NPR radio broadcast May 9, 2008) (transcript available at http://www.thisamericanlife.org/radio-archives/episode/355/transcript) ("And while the FBI and other law enforcement folks say they don't have the exact numbers, it's clear that fraud . . . was ubiquitous.").  The bank conduct at issue in the story was exactly the kind of institutional fraud that Osmanson leveled against the Banks.  *See id.* (discussing "no income verification" loans).

Osmanson's sentencing memorandum also cited a March 22, 2009 *Dateline* television broadcast.  (Doc. 66 at 2.)[7]  The broadcast's accompanying writeup includes the following:

> Last week FBI Deputy Director John Pistole told the House Committee on Financial Services that the Bureau currently has approximately 2,000 open investigations into mortgage fraud, up dramatically from 881 in 2006.  In addition, Pistole said, there are 566 corporate fraud investigations underway, including at least 43 into "matters directly related to the current financial crisis."

*Inside the Financial Fiasco*, Dateline NBC (Mar. 22, 2009), http://www.nbcnews.com/id/

---

[7]  Notably, the *Dateline* story ran well before Osmanson's change-of-plea hearing.

29827248/ns/dateline_nbc-the_hansen_files_with_chris_hansen/t/if-you-had-pulse-we-gave-you-loan/.[8]  Again, the federal fraud investigations related to exactly the kind of conduct that Osmanson had alleged against the Banks.  *See id.* (discussing "liar loans").

Osmanson has not advanced any argument for equitably tolling § 2255's limitations period; even if he had, however, there is no basis for equitable tolling in this case.  The Second Circuit has recognized that equitable tolling of AEDPA's limitations period is appropriate "in rare and exceptional" circumstances.  *Green v. United States*, 260 F.3d 78, 82 (2d Cir. 2001).  "To equitably toll the one-year limitations period, a petitioner must show that extraordinary circumstances prevented him from filing his petition on time, and he must have acted with reasonable diligence throughout the period he seeks to toll."  *Hizbullahankhamon v. Walker*, 255 F.3d 65, 75 (2d Cir. 2001) (internal quotation marks and citation omitted).  Here, Osmanson has not met his burden on either of the equitable-tolling elements.

Since the factual predicate for Osmanson's habeas claim was—with only minimal diligence—discoverable well before October 2012 (and in fact was discoverable even prior to Osmanson's 2008 indictment), his October 2013 § 2255 Motion is time-barred.  Although that conclusion would be sufficient to resolve the case, I nevertheless address the remaining issues that the parties have raised.

---

[8] By early 2010, the federal government's interest in investigating and halting financial institution fraud was evidenced by Congress's enactment of the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617.

### III.    Osmanson's § 2255 Motion is Procedurally Barred

Noting that Osmanson did not appeal his conviction, the government asserts that Osmanson has defaulted on his claim regarding the failure at sentencing to present the Court with evidence of the Banks' own misconduct or the government's knowledge of that misconduct.  Osmanson maintains that the procedural-default argument misconstrues his constitutional claim, and that his claim satisfies both the "cause" and "prejudice" prongs necessary for avoiding procedural default.

"[A] § 2255 motion is not a substitute for direct appeal," and courts "will not afford collateral review to claims that a petitioner failed properly to raise on direct review unless the petitioner shows (1) good cause to excuse the default and ensuing prejudice, or (2) actual innocence."  *Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012). Here, Osmanson does not allege actual innocence.  (*See* Doc. 106 at 3 ("Osmanson is not seeking to avoid taking responsibility for his crimes.  He fully accepts blame for the role he played in the fraud.").)  He also does not claim that he did not (or could not) raise the Banks' complicity at the time of sentencing—he did do that.  (*See id.* at 10–11.)  What Osmanson does claim is that, at his sentencing, the prosecution wrongfully disputed his representations that the Banks were complicit in the fraud, "and then went further by casting aspersions on Mr. Osmanson for making" those representations.  (*Id.* at 11.)

#### A.    Cause

To establish cause, Osmanson must demonstrate "'some objective factor external to the defense' that impeded his ability to appeal."  *United States v. Newton*, No. 5:11-cr-50-1, 2014 WL 348195, at *6 (D. Vt. Jan. 31, 2014) (quoting *McCleskey v. Zant*, 499

U.S. 467, 493 (1991)).  "An 'objective factor' may include the state's creation of an external impediment, situations in which the factual or legal basis for a claim was not reasonably known by the petitioner, or ineffective assistance of counsel."  *Id.* (internal quotation marks omitted); *see also Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) ("Cause may be demonstrated with a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by state officials made compliance impracticable, . . . [or that] the procedural default is the result of ineffective assistance of counsel." (internal quotation marks omitted)).  Osmanson argues that the prosecution created an "external impediment" and also a situation "in which the factual or legal basis for a claim was not reasonably known" by failing to disclose the Banks' complicity and the government investigations.  (Doc. 106 at 12.)

It is true that the prosecution did refer to the Banks as victims, and did not explicitly mention the fact that the government was investigating the Banks for their own fraudulent mortgage practices.  However, neither of those facts impeded the defense's ability to raise the government's own investigation of the Banks at sentencing, or to pursue an appellate claim based on the prosecution's alleged failure to mention the ongoing federal investigation.  As discussed above, the fact that the government was investigating the Banks was very public in the months leading up to Osmanson's arraignment, and even more details had emerged by the time of the sentencing.  The prosecution did not highlight the federal investigation into the Banks' conduct, but it did not create an impediment to the presentation of that fact.  The fact that the government was investigating the Banks was reasonably available to the defense.

### B.      Prejudice

To establish prejudice, Osmanson must demonstrate "that the constitutional errors raised in the motion actually and substantially disadvantaged his defense so that he was denied fundamental fairness."  *Newton*, 2014 WL 348195, at *6.  Osmanson correctly notes that due process forbids sentencing "based on materially false information" or "based on a material misapprehension of fact."  *Torres v. United States*, 140 F.3d 392, 404 (2d Cir. 1998).  According to Osmanson, "the government's denial of the Banks' active involvement was a 'material misrepresentation of fact.'"  (Doc. 106 at 13.)  He also asserts that the prosecution's alleged wrongdoing "shifted the entire focus of sentencing" to a discussion of "whether Mr. Osmanson himself deserved a leadership role enhancement, when the real topic of discussion should have been the extent to which he was actively assisted by the Banks."  (*Id.*)

If the Court agrees that Osmanson has failed to demonstrate cause, then it is unnecessary to also address prejudice.  In any case, for the reasons discussed below, no prejudice would result if the Court did not examine the merits of Osmanson's claim because the claim is not meritorious.

## IV.    Osmanson's § 2255 Motion Fails on the Merits

In his § 2255 Motion, Osmanson advances four grounds for relief.  He has withdrawn one of those grounds (*see* Doc. 106 at 4 n.7), leaving the following three: (1) a due process claim arising out of the prosecution's alleged false and misleading statements; (2) a due process claim arising out of the Court's reliance at sentencing upon the alleged false and misleading statements; and (3) a claim that the prosecution violated

its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963).  (Doc. 87 at 4–5.)  In

opposition, the government argues that Osmanson's Motion is meritless because: (1) the

Court knew Osmanson did not act alone; (2) the prosecution did not misrepresent the

Banks as victims because, even if individuals within the Banks had similar schemes, the

Banks were still defrauded by Osmanson; (3) the information allegedly omitted or

withheld at sentencing was irrelevant because wire fraud does not require actual reliance

on misrepresentation; and (4) each of Osmanson's claims therefore fails.  (Doc. 98 at 9–

15.)  Osmanson disputes the government's arguments.  (Doc. 106 at 13.)

### A.    Relevance of the Information

I begin with the government's assertion that the information allegedly omitted or

withheld at sentencing was irrelevant, and that all of Osmanson's claims therefore fail.

The government asserts that the Banks' actual reliance on the documentation that

Osmanson submitted was irrelevant to his fraud conviction.  According to the

government, any fault on the part of the Banks (e.g., failing to review the false statements

in Osmanson's applications) is irrelevant because actual reliance is not an element of the

crimes for which Osmanson was convicted.  (*See* Doc. 98 at 11.)  Osmanson maintains,

however, that the role of the Banks "was highly relevant for purposes of § 3553 analysis

at his sentencing because it pertained directly to the 'nature and circumstances of the

offense.'"  (Doc. 106 at 16 (quoting 18 U.S.C. § 3553(a)(1)).)

Here, the role of all participants in Osmanson's scheme was relevant to the

sentencing determination.  Whether or not the Banks were at fault for soliciting false loan

applications or for failing to review those applications might be irrelevant on the question

of Osmanson's *liability* for his crimes.  But for the purposes of *sentencing*, the roles of

each participant were clearly relevant.  The Court should reject the government's

"relevance" argument.  However, as discussed below, Osmanson's claims fail on their

merits for other reasons.

### B.  Osmanson's *Brady* Claim

"*Brady* requires that the government disclose material evidence favorable to a

criminal defendant."  *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012).  "There

are three components of a true *Brady* violation: The evidence at issue must be favorable

to the accused, either because it is exculpatory, or because it is impeaching; that evidence

must have been suppressed by the State, either willfully or inadvertently; and prejudice

must have ensued."  *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en

banc) (citation and internal quotation marks omitted).

The government asserts that Osmanson "cannot suggest that the information was

even within the control of the government at the time of his sentencing."  (Doc. 98 at 13.)

Asserting that the Justice Department's left hand is presumed to know what the right

hand is doing, Osmanson maintains that the prosecution "had a duty to know about, and

under *Brady* disclose, any ongoing civil or criminal investigations of the Banks."  (Doc.

106 at 17.)  However, as the Second Circuit has explained, "knowledge on the part of

persons employed by a different office of the government does not in all instances

warrant the imputation of knowledge to the prosecutor."  *United States v. Avellino*, 136

F.3d 249, 255 (2d Cir. 1998).

Knowledge might be imputed where multiple offices of government are involved in a criminal investigation. *Cf. United States v. Locascio*, 6 F.3d 924, 948–49 (2d Cir. 1993) (refusing to impute to the prosecuting AUSAs knowledge of reports prepared by FBI agents who were "uninvolved in the investigation or trial of the defendants-appellants"). Here, it appears that the FBI played a role in the investigation of Osmanson's crimes. It is not clear whether that work on the part of the FBI was part of the FBI's investigation of the Banks, so for that reason I conclude that the present record is insufficient to resolve the question of imputation.

However, Osmanson's *Brady* claim fails for a different reason. "Evidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Gonzalez,* 110 F.3d 936, 944 (2d Cir. 1997) (alterations, citation, and internal quotation marks omitted). Here, for the reasons discussed above, the evidence at issue was not suppressed. The authorities cited in Osmanson's January 4, 2010 sentencing memorandum included references to the federal investigation of the Banks' mortgage lending practices. Even if defense counsel did not have actual knowledge of the federal investigation, she should have known about it based on the authorities cited in the sentencing memorandum and the extensive media coverage of the investigation. Since there was no suppression, Osmanson's *Brady* claim fails.

### C.      Osmanson's Due Process Claims

As noted above, due process forbids sentencing "based on materially false information" or "based on a material misapprehension of fact."  *Torres*, 140 F.3d at 404. Here, Osmanson's due process claims are focused on the alleged false or incomplete information presented to and relied upon by the Court.

### 1.      Banks as "Victims"

As noted above, the prosecution in its sentencing memorandum and at the sentencing hearing described the Banks as victims of Osmanson's scheme.  A major theme of Osmanson's Motion is his assertion that the prosecution knew or should have known that the federal government was investigating the Banks for fraud, but at sentencing portrayed the Banks as "lily-white 'victims.'"  (Doc. 87 at 6.)  According to Osmanson, that was at best misleading, and at worst was intentional misconduct.  The government, however, insists that the Banks were victimized by Osmanson's false representations.  (Doc. 98 at 10.)  The government makes a distinction between the Banks' employees and its shareholders, arguing: "While employees of the banks, like the employees of mortgage companies who were also prosecuted in this case, may have encouraged Osmanson's lies, the bank's shareholders, i.e., those individuals who bear the burden of losses by the bank corporation, did not do so."  (*Id.*)  In reply, Osmanson contends that "the Banks cannot fairly be portrayed as victims of a fraud they knew about and facilitated."  (Doc. 106 at 15.)

Initially, it is important to note that the prosecution did not characterize the Banks as being entirely without fault.  At the sentencing hearing, the prosecution conceded that

the Banks had offered "some really horrible products" (Doc. 83 at 147:24–25), and that there were market problems.  In any case, the prosecution could properly describe the Banks as "victims" of Osmanson's scheme.  Of course, there is a certain logic to the idea that "a participant in a fraud cannot claim to be a victim of its own fraud."  *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 596 (7th Cir. 2012).  But there is a distinction between any institutional fraud perpetrated by the Banks, and the particular scheme perpetrated by Osmanson.  This is not to say that the schemes were unrelated; as the Court found, Osmanson's scheme was facilitated by the wrongful conduct of others.  (*See* Doc. 83 at 164:4–6 ("Mr. Osmanson you would not be here but for perhaps the market, perhaps for other people who assisted you in this fraud . . . .").)[9]  Nevertheless, the Banks—even if they were involved in their own institutional fraud—were defrauded by Osmanson's particular scheme.

The prosecution made a similar argument with its burglary analogy.  Osmanson attacks that analogy as indicative of the government's minimization of the Banks' role in the offense.  According to Osmanson, the analogy fails to capture the true nature of the relevant facts because unlike the negligent resident who leaves the door unlocked, the Banks actually *invited* the "burglars" in.  Osmanson argues that the Banks:

> [A]*dvertised* that the door was unlocked, *provided* the information, in the form of fraudulent income levels, necessary to get through the door, *announced* that anyone could enter the home, *handed* the purportedly stolen merchandise to the entrant, *assured* the entrant he would not get caught, and then *profited immensely* from the whole process.

---

[9]  Notably, the Court elected not to impose the leadership enhancement.

(Doc. 106 at 14.)  Certainly the prosecution's analogy was not perfect, but the point was not to precisely characterize the Banks' wrongdoing.  Instead, the prosecution was essentially arguing that there were at least two wrongs: the institutional wrongs that created the conditions for Osmanson's scheme, and Osmanson's scheme itself.  The record demonstrates that the Court understood that distinction.  As to the Court's knowledge of the Banks' wrongdoing, the parties' positions are in stark contrast.

### 2.    The Court's Knowledge of the Banks' Role

According to the government, the Court knew that Osmanson did not act alone, and was also aware that "potential bank misconduct furthered his crime."  (Doc. 98 at 9.) Osmanson maintains that "the Banks were far more complicit than the government led the Court to believe at sentencing" and that "[b]ased on the record evidence, it is clear that the District Court did not understand the Banks' role."  (Doc. 106 at 13–14.) According to Osmanson:

> Had the truth been part of the sentencing colloquy, it would have cast Mr. Osmanson in a fundamentally different light.  The Court would have understood Mr. Osmanson not as someone potentially deserving a leadership role enhancement, but as a single cog in a big machine powered by greed from the top down.

(*Id.* at 14.)

Here, neither party highlighted for the Court the fact that the federal government was investigating the Banks for their own fraudulent mortgage practices.  However, both parties presented their own positions on the role of the Banks.  The record demonstrates that the Court was aware of potentially criminal or wrongful acts of others (including the Banks), but concluded that with respect to the specific scheme at issue, Osmanson was at

the center.  There is no indication that the Court fundamentally misunderstood the Banks'

role just because neither party directly mentioned the federal government's investigation.

Nor does it seem plausible that the presentation of that information would have

converted a "close" case on the leadership-role enhancement into a case where Osmanson

would be sentenced only as a minor player in a vast top-down scheme.  Even assuming

that the Court was not in fact aware of the investigation, such awareness would have

added little to the analysis that the Court was performing.  The Court noted that greater

market forces had created an opportunity for Osmanson's scheme, but (quite properly)

focused primarily on the particular scheme that Osmanson orchestrated.  As stated above,

the Court recognized the wrongdoing of the Banks and others, but found that Osmanson

was at the center of his particular mortgage-fraud scheme.

## Conclusion

For the reasons set forth above, Osmanson's Motion for Leave to Conduct

Discovery and his request for an evidentiary hearing (Doc. 106) is DENIED, and I

recommend that his § 2255 Motion (Doc. 87) be DISMISSED.

Dated at Burlington, in the District of Vermont, this 21st day of July, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service
thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties,
written objections which shall specifically identify those portions of the Report and
Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. §
636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections
"operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y
of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).